Slip Op. 20-125

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **HUSTEEL CO., LTD.,**<br><br>    **Plaintiff,**<br><br>**and**<br><br>**NEXTEEL CO., LTD. ET AL.,**<br><br>    **Consolidated Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES**<br><br>    **Defendant,**<br><br>**and**<br><br>**MAVERICK TUBE CORPORATION ET AL.,**<br><br>    **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | **Before: Claire R. Kelly, Judge**<br><br>**Consol. Court No. 19-00112** |

## <u>OPINION AND ORDER</u>

[ Remanding the U.S. Department of Commerce's final determination in the second administrative review of the antidumping duty order covering welded line pipe from the Republic of Korea. ]

Dated: August 26, 2020

<u>Donald B. Cameron</u> and <u>Brady W. Mills</u>, Morris, Manning & Martin LLP, of Washington, DC, argued for plaintiff Husteel Co., Ltd. Also on the briefs were <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Sabahat Chaudhary</u>, <u>Edward J. Thomas III</u>, and <u>Jordan L. Fleischer</u>.

Jaehong D. Park, Henry D. Almond, Kang W. Lee, and Leslie C. Bailey, Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for consolidated plaintiffs Hyundai Steel Company and NEXTEEL Co., Ltd. Also on the briefs was Daniel R. Wilson.

Jeffrey M. Winton, Winton & Chapman PLLC, of Washington, DC, argued for consolidated plaintiff SeAH Steel Corporation. Also on the briefs was Amrietha Nellan.

Robert R. Kiepura, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  Also on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of Counsel was Reza Karamloo, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Elizabeth J. Drake, Schagrin Associates, of Washington, DC, argued for defendant-intervenors California Steel Industries and Welspun Tubular LLC USA. Also on the brief were Roger B. Schagrin, Christopher T. Cloutier, and Luke A. Meisner.

Kristina Zissis and Frank J. Schweitzer, White & Case, LLP, of Washington, DC, argued for defendant-intervenors Maverick Tube Corporation and IPSCO Tubulars Inc. Also on the brief were Gregory J. Spak and Matthew W. Solomon.

Kelly, Judge:  This consolidated action is before the court on motions for judgment on the agency record filed respectively by Husteel Co., Ltd. ("Husteel"), SeAH Steel Corporation ("SeAH"), NEXTEEL Co., Ltd. ("NEXTEEL"), and Hyundai Steel Company ("Hyundai") (collectively, "Plaintiffs").  See Pl. [Husteel]'s Mot. J. Agency R., Dec. 18, 2019, ECF No. 46; [Consol. Pl. SeAH]'s Mot. J. Agency R., Dec. 18, 2019, ECF No. 41; Consol. Pl. [NEXTEEL]'s 56.2 Mot. J. Agency R., Dec. 18, 2019, ECF No. 44; Consol. Pl. [Hyundai]'s 56.2 Mot. J. Agency R., Dec. 18, 2019, ECF No. 45.  Plaintiffs challenge various aspects of the final results of the U.S. Department of Commerce's ("Commerce" or "Department") second administrative review of the

antidumping duty ("ADD") order covering welded line pipe ("WLP") from the Republic of Korea ("Korea").  <u>See</u> Pl. [Husteel]'s Br. Supp. Mot. J. Agency R., Dec. 18, 2019, ECF No. 46-2 ("Husteel's Br."); [SeAH]'s Br. Supp. 56.2 Mot. J. Agency R. Confidential Version, Dec. 18, 2019, ECF No. 41-1 ("SeAH's Br."); Consol. Pl. [NEXTEEL]'s Memo. Supp. 56.2 Mot. J. Agency R., Dec. 18, 2019, ECF No. 44-1 ("NEXTEEL's Br."); Consol. Pl. [Hyundai]'s Memo. Supp. 56.2 Mot. J. Agency R., Dec. 18, 2019, ECF No. 45-1 ("Hyundai's Br."); <u>see also</u> <u>Welded Line Pipe From the Republic of Korea</u>, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019) (final results of [ADD] admin. review and final determination of no shipments; 2016–2017) ("<u>Final Results</u>") <u>as amended by</u> 84 Fed. Reg. 35,371 (Dep't Commerce July 23, 2019) (amended final results of [ADD] admin. review; 2016–2017) ("<u>Amended Final Results</u>") and accompanying Issues and Decision Memo. for the [<u>Final Results</u>], A-580-876, (June 7, 2019), ECF No. 36-5 ("Final Decision Memo").

SeAH challenges Commerce's decision to reject its third country sales and to use constructed value to determine the normal value of its sales of subject merchandise into the United States.  SeAH's Br. at 7–18.  Further, Plaintiffs contest various aspects of Commerce's constructed value methodology.  <u>See</u> SeAH's Br. at 18–36, 43–49; NEXTEEL's Br. at 15–44; Husteel's Br. at 14–31; <u>see generally</u> Hyundai's Br.

Namely, Plaintiffs challenge as contrary to law and unsupported by substantial evidence Commerce's determination that a particular market situation

("PMS") in Korea distorts the cost of production for WLP, as well as the resultant PMS adjustments to SeAH's and NEXTEEL's reported costs when determining the constructed value of the subject merchandise. See SeAH's Br. at 18–33; NEXTEEL's Br. at 15–38; Husteel's Br. at 14–27; see generally Hyundai's Br. SeAH and NEXTEEL object to Commerce's reliance on the constructed value profit ratio ("CV profit ratio") and selling expenses calculated for Hyundai from the first administrative review of the ADD order to calculate profit and selling expenses for SeAH and NEXTEEL. See SeAH's Br. at 43–49; NEXTEEL's Br. at 38–41. NEXTEEL challenges Commerce's decision to reduce the constructed value of its sales of WLP to account for certain losses associated with the production and sale of "non-prime products," see NEXTEEL's Br. at 41–43, as well as Commerce's decision to reclassify losses associated with the suspension of certain product lines from cost of goods sold to general and administrative ("G&A") expenses when determining constructed value. See NEXTEEL's Br. at 43–44. SeAH challenges Commerce's refusal to apply its quarterly-average methodology to calculate SeAH's costs when determining constructed value. See SeAH's Br. at 33–36.

Further, SeAH challenges Commerce's method and justification for allocating the G&A expenses of its U.S. sales affiliate Pusan Pipe America ("PPA") when adjusting the constructed export price of its U.S. sales. See SeAH's Br. at 37–42. Husteel challenges Commerce's calculation of the non-examined companies' rate. See Husteel's Br. at 28–32.

For the reasons that follow, the court remands Commerce's determination that SeAH's third country sales into the Canadian market are nonrepresentative for further explanation or reconsideration.  Moreover, regarding its calculation of constructed value, the court remands for further explanation or reconsideration Commerce's: PMS determination and resultant adjustment to the reported cost of production for WLP; reliance on the CV profit ratio and selling expenses calculated for Hyundai in the first administrative review; reclassification of NEXTEEL's reported losses relating to the suspended production of certain product lines; adjustment to NEXTEEL's constructed value to account for sales of non-prime products; and refusal to employ its quarterly costs methodology to calculate SeAH's constructed value.  Additionally, the court remands Commerce's decision to allocate PPA's G&A expenses across all of SeAH's U.S. sales of WLP when calculating SeAH's constructed export price for further explanation or reconsideration.  Any modifications to the dumping margins of NEXTEEL and SeAH resulting from this remand shall be reflected in the rate applied to Husteel.

## BACKGROUND

On February 23, 2018, in response to timely requests by interested parties, Commerce initiated an administrative review of various ADD and countervailing duty ("CVD") orders and findings, including an ADD order covering WLP from

Korea.[1]  See Initiation of Antidumping and Countervailing Duty Admin. Reviews, 83 Fed. Reg. 8,058, 8,060 (Dep't Commerce Feb. 23, 2018); see also Welded Line Pipe From the Republic of Korea and the Republic of Turkey, 80 Fed. Reg. 75,056 (Dep't Commerce Dec. 1, 2015) ([ADD] orders).  On March 7, 2017, Commerce selected NEXTEEL and SeAH as mandatory respondents.  See Resp't Selection Memo. at 1, 3–4, PD 22, bar code 3684544-01 (Mar. 19, 2018).

On August 7, 2018, Defendant-Intervenors Maverick Tube Corporation ("Maverick"), California Steel Industries ("CSI"), IPSCO Tubulars Inc. ("IPSCO Tubulars"),[2] and Welspun Tubular LLC USA ("Welspun") (collectively, "Domestic Interested Parties"), submitted to Commerce a letter alleging that a PMS in Korea distorted the cost of production for WLP.  See generally PMS Allegation and Factual Info., PD 150–164, CD 171–186, bar codes 3740576-01–15, 3740543-01–16 (Aug. 7, 2018) ("PMS Allegation").  Namely, the Domestic Interested Parties alleged that the PMS in Korea distorted the cost of hot-rolled steel coil ("HRC"), an input used to produce WLP.  See generally id.

---

[1] Each year during the anniversary month of the publication of an ADD order, interested parties may request that Commerce conduct an administrative review of that order.  See 19 C.F.R. § 351.213 (2018); see also 19 U.S.C. § 1677(9) (2012) (defining interested parties).

[2] On February 7, 2020, defendant-intervenor IPSCO Tubulars Inc., formerly referred to as "TMK IPSCO", filed on the docket a letter apprising the court of its acquisition by Tenaris, S.A, corporate restructuring, and resultant change in name.  See Letter Regarding Acquisition & Party Name, Feb. 7, 2020, ECF No. 52.

Commerce published its preliminary results on February 14, 2019.  See Welded Line Pipe From the Republic of Korea, 84 Fed. Reg. 4,046 (Dep't Commerce Feb. 14, 2019) (prelim. results of [ADD] admin. review and prelim. determination of no shipments; 2016–2017) ("Prelim. Results") and accompanying Decision Memo. for the [Prelim. Results], A-580-876, PD 271, bar code 3791152-01 (Feb. 7, 2019) ("Prelim. Decision Memo").

Finding the aggregate volume of SeAH's and NEXTEEL's WLP sales in the home market insufficient, Commerce considered calculating normal value for both respondents based on third country sales.  See Prelim. Decision Memo at 18–19 (citing section 773(a)(1)(C)(ii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677b(a)(1)(C)(ii) (2012);[3] 19 C.F.R. § 351.404 (2018)).[4]  After determining that NEXTEEL did not have a sufficient volume of sales in any comparator market, and that SeAH's sales into Canada were not representative within the meaning of 19 U.S.C. § 1677b(a)(1)(B)(ii),[5] Commerce calculated SeAH's and NEXTEEL's margins

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.  All further citations to 19 U.S.C. §§ 1677 and 1677b(e) are to the 2015 version, as amended pursuant to the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015) ("TPEA").

[4] Further citations to Title 19 of the Code of Federal Regulations are to the 2018 edition.

[5] Commerce cited its previous reliance on the Canadian International Trade Tribunal's ("CITT") final determination that SeAH's sales of steel line pipe into Canada were dumped.  See Prelim. Decision Memo at 19 (citing Welded Line Pipe From the Republic of Korea, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018)

(footnote continued)

using constructed value.  <u>See</u> Prelim. Decision Memo at 10 n.36, 18–19 (citing 19 U.S.C. § 1677b(a)(1)(B)(ii)).

Commerce made several contested decisions when calculating the constructed value of SeAH's and NEXTEEL's sales of WLP.  First, finding that a PMS exists that distorts the cost of production for WLP, Commerce upwardly adjusted SeAH's and NEXTEEL's reported costs of HRC by the CVD rate applied to HRC producers from Commerce's CVD investigation into hot-rolled steel products from Korea.[6]  <u>See</u> Prelim. Decision Memo at 16; <u>see also</u>  <u>[CVD] Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea</u>, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) (final affirmative determination) <u>as amended by</u> 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) ("<u>Hot-Rolled Steel from Korea CVD</u>") and accompanying Issues and Decision Memo. for [<u>Hot-Rolled Steel from Korea CVD</u>], C-580-884, (Aug. 4, 2016) <u>available at</u> https://enforcement.trade.gov/frn/summary/korea-south/2016-19377-1.pdf (last visited Aug. 17, 2020) ("Hot-Rolled Steel from Korea CVD IDM").  Second, Commerce used the CV profit and selling expenses for Hyundai from the first administrative

---

(final results of [ADD] admin. review; 2015–2016) ("<u>WLP from Korea 2015–2016</u>") <u>as amended by</u> 83 Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2018) (amended final results of [ADD] admin. review; 2015–2016) and accompanying Issues and Decision Memo. for [<u>WLP from Korea 2015–2016</u>], A-580-876, (July 11, 2018), available at Cmt. 12 https://enforcement.trade.gov/frn/summary/korea-south/2018-15327-1.pdf (last visited Aug. 30, 2020).

[6] The CVD rate was based on total facts available with an adverse inference.  <u>See</u> Hot-Rolled Steel from Korea CVD IDM at 7–11.

review of the ADD order to determine profit and selling expenses for NEXTEEL and

SeAH in this review.  See Prelim. Decision Memo at 20, 22–26.  Third, Commerce

found that some of NEXTEEL's WLP sales related to "non-prime" products with a

lower market value, and accounted for the loss associated with those sales by

reducing the constructed value of NEXTEEL's "prime" WLP sales.  See id. at 22–23;

see also Final Decision Memo at 42–43.  Fourth, Commerce reclassified certain losses

incurred by NEXTEEL, associated with suspended production of certain product lines

during the period of review ("POR"), from cost of goods sold, allocated to those product

lines specifically, to G&A expenses attributable to the operations of the entire

company, and adjusted NEXTEEL's G&A expense ratio accordingly.  See Prelim.

Decision Memo at 22–23; see also Final Decision Memo at 43–44.  Finally, when

examining SeAH's cost data for purposes of calculating G&A expenses, interest,

profit, selling expenses, and U.S. packing costs, after assessing SeAH's claim that it

experienced substantial cost and price changes during the POR, Commerce declined

to apply its quarterly-average costs methodology.  See Prelim. Decision Memo at 22.

Commerce preliminarily calculated weighted-average dumping margins of 50.09

percent for NEXTEEL, 26.47 percent for SeAH, and 41.53 percent for non-selected

respondents.  Prelim. Results, 84 Fed. Reg. at 4,047.

On August 10, 2018, Commerce published its Amended Final Results, and

recalculated respondents' weighted-average dumping margins.  See generally,

Amended Final Results and Final Decision Memo.[7]   For its final determination, Commerce deducted from SeAH's constructed export price G&A expenses incurred by its U.S. sales affiliate PPA by allocating those expenses to all of SeAH's U.S. sales.[8] See Final Decision Memo at 58–61.   The remaining aspects of Commerce's preliminary determination, discussed above, did not change.   See generally Final Decision Memo.   Commerce assigned rates of 38.87 percent for NEXTEEL, 22.70 percent for SeAH, and 29.89 percent for non-selected respondents.   See Amended Final Results, 84 Fed. Reg. at 35,372.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.   The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

---

[7] Commerce amended its Final Results to correct for a ministerial error not relevant to this dispute.  Amended Final Results, 84 Fed. Reg. at 35,371.

[8] Although Commerce discusses its determination with respect to both PPA and State Pipe and Supply Inc., see Final Decision Memo at 59, SeAH briefs before this court only dispute the Commerce's treatment of PPA's G&A expenses.   See generally SeAH's Br.; [SeAH's Amended] Reply Br., Apr. 15, 2020, ECF No. 69.

## DISCUSSION

### I.    Rejection of SeAH's Third Country Sales

SeAH argues that Commerce's decision to calculate the normal value of its sales based on constructed value, instead of third country sales, is unreasonable and contrary to law. See SeAH's Br. at 7–18. SeAH expounds, inter alia,[9] that Commerce relies on the CITT's finding that SeAH's sales into Canada were dumped to determine that its sales are not representative without considering detracting evidence that Canadian dumping law is materially inconsistent with U.S. dumping law. See SeAH's Br. at 13–16. Defendant submits that it is reasonable for Commerce to rely on the CITT's finding. See Def.'s Br. at 44–48. For the reasons that follow, the court remands Commerce's decision to disregard SeAH's third country sales into Canada.

Where Commerce finds that home market sales are an inappropriate basis for determining normal value, it may instead use third country sales. See 19 U.S.C. § 1677b(a)(1). Commerce may only rely on third country sales where the "prices [for those sales] are representative," where the aggregate quantity of sales are at a sufficient level, and where Commerce does not determine that a PMS prevents a proper comparison between the export price, or constructed export price, and the third country price. See 19 U.S.C. § 1677b(a)(1)(B)(ii). The statute does not define

---

[9] SeAH argues, as a general matter, that U.S. law does not permit a court to give 'recognition' to a foreign finding of dumping. SeAH's Br. at 9–10 (citations omitted). It does not appear that Commerce seeks recognition of a foreign judgment, but rather, that it views the CITT's dumping finding as substantial evidence that SeAH's sales are not representative. See Final Decision Memo at 48–50.

what it means for prices to be representative, but Commerce's regulations and regulatory history reveal that where the aggregate quantity of third country sales are at a sufficient level, those sales are presumptively representative unless proven otherwise.   See 19 C.F.R. § 351.404(b)–(c) (providing that Commerce shall consider a third country market viable if the aggregate quantity of sales are at a sufficient level, but setting forth an exception where it is established, to the satisfaction of Commerce, that, inter alia, the prices are not representative); Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,357 (Dep't Commerce May 19, 1997);[10] see also Alloy Piping Prods v. United States, 26 CIT 360, 339–340, 201 F. Supp. 2d 1267, 1276–77 & n.7 (2002) (citations omitted).  Commerce's determination that sales into a third country comparator market are not representative must be supported by substantial evidence. See, e.g., Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut.

---

[10] The regulatory history to 19 C.F.R. § 351.404 provides, in pertinent part, that:

> In the Department's view, the criteria of a "particular market situation" and the "representativeness" of prices fall into the category of issues that the Department need not, and should not, routinely consider . . . the [Statement of Administrative Action] at 821 recognizes that the Department must inform exporters at an early stage of a proceeding as to which sales they must report.  This objective would be frustrated if the Department routinely analyzed the existence of a "particular market situation" or the "representativeness" of third country sales . . . the party alleging . . . that sales are not "representative" has the burden of demonstrating that there is a reasonable basis for believing that a "particular market situation" exists or that sales are not "representative."

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. at 27,357; see also Statement of Administrative Action, H.R. Doc. No. 103-826, vol. 1, at 821 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4162.

Auto. Ins. Co., 463 U.S. 29, 48–49 (1983).  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)).

Commerce's reliance on the CITT's finding that SeAH's sales into Canada were dumped to determine that those sales are not representative is unreasonable because Commerce does not address detracting evidence that Canadian antidumping law is materially inconsistent with U.S. antidumping law.  See Final Decision Memo at 48–50;  see also 19 U.S.C. § 1677b(a)(1)(B)(ii)(I).  For example, SeAH argued before Commerce that the Canada Border Services Agency ("CBSA") applied the equivalent of facts available to SeAH for failing to report home market sales of merchandise produced by another manufacturer.  See Final Decision Memo at 46; SeAH's Case Brief at 6, PD 307–308, CD 364–365, bar codes 3815200-01–02, 3815197-01–02 (Apr. 4, 2019) ("SeAH's Case Br."); [SeAH]'s Rebuttal CV Cmts. at 2, Attachment 1, PD 166, CD 187, bar code 3741545-01, 3741544-01 (Aug. 9, 2018).  SeAH explained that, under U.S. law, the reporting of such sales "would never be relevant" because "normal value can only be based on sales of products that were made by the same producer that made the products exported to the United States."  See SeAH's Case Br. at 6 & n. 12 (citing 19 U.S.C. § 1677(16)).  Commerce notes SeAH's contention that its sales into Canada would not be considered dumped under U.S. law, but responds by stating "[t]he fact that Commerce's methodology may differ from that of the CBSA does not

negate Canada's finding of dumping."  Final Decision Memo at 49.  This response does not explain why the differences between methodologies do not detract from the evidentiary weight of the CITT's finding, but merely concludes that they do not.  As such, Commerce's determination that SeAH's sales into Canada are not representative fails to address detracting evidence and cannot be sustained.

## II.   Commerce's CV Calculation

### 1.   Particular Market Situation

Plaintiffs argue Commerce's determination that distortions present in the Korean market collectively give rise to a PMS that renders the costs of HRC outside the ordinary course of trade is unsupported by substantial evidence, and that the resultant adjustments to SeAH's and NEXTEEL's reported costs are unreasonable. See NEXTEEL's Br. at 15–38; SeAH's Br. 18–33; Hyundai's Br. at 7–8; Husteel's Br. at 14–24, 26–27.  Defendant and the Domestic Interested Parties maintain that Commerce's PMS determination and adjustments to SeAH's and NEXTEEL's reported costs are reasonable and lawful.  See Def.'s Br. at 10–41; Def.-Intervenors [CSI, TMK IPSCO, & Welspun's] Resp. Br. at 8–34, Mar. 18, 20[20], ECF No. 60 ("CSI & Welspun's Br."); Def-Intervenors [Maverick & IPSCO Tubulars'] Resp. Br. at 1, Mar. 18, 2020, ECF No. 61 ("Maverick & IPSCO Tubulars' Br.").  For the reasons that follow, Commerce's determination is remanded for further explanation or reconsideration.

When reviewing an ADD order, Commerce determines antidumping duties owed on entries of subject merchandise by calculating the amount by which the normal value of the merchandise exceeds its export price (or constructed export price). See 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C); see also id. at § 1677(35).  Commerce usually relies on sales of the subject merchandise in the home market, or sales in a third country comparator market, to determine normal value.  See id. at § 1677b(a)(1)(B)(i)–(ii).  However, if Commerce determines that it cannot rely on home market or third country market sales, Commerce may determine the normal value of the subject merchandise based on constructed value.  See id. at § 1677b(a)(4).

The constructed value of the subject merchandise is the sum of the costs of materials and fabrications or other processing of any kind employed to produce the merchandise, plus an amount for selling expenses, G&A expenses, and for profits, plus the cost of packing and shipping to the United States.  See 19 U.S.C. § 1677b(e). If Commerce finds that a PMS exists such that the "costs of materials and fabrications or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," Commerce may use any other reasonable calculation methodology.   See id.  To establish the existence of a PMS, Commerce must demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price.  See 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), (C)(iii); 1677(15)(C). Those determinations must be supported by substantial evidence, such that a

reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence.  See Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).

Commerce finds that a PMS exists in Korea that distorts the cost of HRC, the main input in WLP production, based on the cumulative effect of Chinese steel overcapacity, the government of Korea's ("GOK") subsidization of hot-rolled steel products,[11] strategic alliances between Korean HRC suppliers and Korean WLP producers, and government control over electricity prices in Korea.  See Final Decision Memo at 17.  Yet, Commerce fails to explain how each factor lends credence to its finding that a PMS distorts the costs of HRC during the POR such that Commerce could not properly determine a constructed value of WLP that could properly be compared to export price (or constructed export price).

First, Commerce points to import data that demonstrates Korea receives the largest volume of Chinese steel exports, creating downward pressure on Korean domestic steel prices.  See Final Decision Memo at 17–18, 20 (citations omitted).  However, Commerce does not explain how this global phenomenon prevents a proper comparison between normal value and export price (or constructed export price).  See, e.g., Final Decision Memo at 21 ("This global excess steel capacity has the potential

---

[11] HRC is a form of hot-rolled steel product. Commerce states that the GOK's subsidization of hot-rolled steel "includes HRC[.]" Prelim. Decision Memo at 15.

to depress steel prices not just in Korea but in various markets.  Although the effect

may vary, steel prices in various countries are likely lower than they would be but for

global excess capacity.").

Second, Commerce cites to dated CVD findings and calculations that resulted

in subsidy rates, based on total adverse facts available with an adverse inference

("AFA"),[12] and which Commerce has since reduced significantly,[13] to corroborate its

finding that government subsidies distort HRC costs in the Korean market during

the POR.  See Final Decision Memo at 17 (citing PMS Allegation Exs. 15, 17); Hot-

Rolled Steel from Korea CVD,  81 Fed. Reg. at 67,960–67,961 (assigning ad valorem

CVD subsidy rates of 58.68 and 3.89 percent to POSCO and Hyundai, respectively);[14]

but see Certain Hot-Rolled Steel Flat Products From the Republic of Korea,  84 Fed.

Reg. 28,461 (Dep't Commerce June 19, 2019) (final results of [CVD] admin. review,

2016)  ("Hot-Rolled Steel from Korea CVD 2016) and accompanying Issues and

---

[12] Parties and Commerce sometimes use the shorthand "AFA" or "adverse facts
available" to refer to Commerce's reliance on facts otherwise available with an
adverse inference to reach a final determination. AFA, however, encompasses a two-
part inquiry established by statute.  See 19 U.S.C. § 1677e(a)–(b). It first requires
Commerce to identify information missing from the record, and second, to explain
how a party failed to cooperate to the best of its ability as to warrant the use of an
adverse inference when "selecting among the facts otherwise available."  Id.

[13]  Commerce denies Hyundai, NEXTEEL, and SeAH's request to base the PMS
adjustments on rates from Hot-Rolled Steel from Korea CVD 2016 because, at the
time that the Final Results were issued, it had only concluded on preliminary CVD
rates.  Final Decision Memo at 27–28 (citations omitted).

[14] Commerce cites Exhibits 15 and 17 of petitioners' PMS Allegation submission,
which are the final decision and calculation memoranda for Hot-Rolled Steel from
Korea CVD.

Decision Memo. for [Hot-Rolled Steel from Korea CVD 2016], C-580-884, (June 11, 2019) available at https://enforcement.trade.gov/frn/summary/korea-south/2019-12991-1.pdf (last visited Aug. 17, 2020) (assigning ad valorem CVD subsidy rates of 0.55 and 0.58 percent to POSCO and Hyundai, respectively).   Nowhere does Commerce explain how the GOK's subsidization of hot-rolled steel, which are already subject to countervailing duties, distort HRC prices in such a way as to prevent a proper comparison between normal value and export price (or constructed export price).   Moreover, given the non-contemporaneity of Commerce's findings in Hot-Rolled Steel from Korea CVD, and the fact that the rate was based on AFA, such findings alone do not constitute an approximation of HRC cost distortions during the POR.

Third, regarding the Domestic Interested Parties' allegation that strategic alliances distort HRC costs, Commerce concedes "the record does not contain specific evidence showing that strategic alliances directly created a distortion in HRC pricing in the current POR," yet speculates that "these strategic alliances and price fixing schemes between certain Korean HRC suppliers and Korean WLP producers are relevant as an element of Commerce's analysis in that they may have created distortions in the prices of HRC in the past, and may continue to impact HRC pricing in a distortive manner during the instant POR and in the future."   Final Decision Memo at 18–19.  Commerce's speculation stems from evidence relating to the Korean Fair Trade Commission's ("KFTC") imposition of penalties on various steel pipe

manufacturers for rigging bids offered by the Korea Gas Corporation for orders of

steel pipe between 2003 and 2013.  See Final Decision Memo at 18 (citing Petitioners'

Home Market Viability Allegation as to SeAH at Exs. 1–2, PD 69–70, bar codes

3711361-01–02 (May 24, 2018)).[15]  These findings are dated and bear no discernible

relation to HRC costs during the POR.  Although Commerce may not need to

demonstrate direct causation when administering the cost-based PMS provision,

Commerce's finding that strategic alliances distorted HRC costs must be reasonably

and discernibly based on record evidence.

Fourth, Commerce cites evidence of the government's use of the electricity

market as a tool of industrial policy and its control of the largest electricity supplier,

the Korea Electric Power Corporation.  Final Decision Memo at 19, 22 & nn. 94–95

(citing PMS Allegation at Ex. 24, Sub-Exs. 2, 8).  Commerce does not explain or

support the claim that the purported government control places a downward pressure

on electricity prices or otherwise renders HRC costs outside the ordinary course of

trade.

Here, Commerce predicates its PMS determination, and adjustment, on the

cumulative effect of various market "distortions" without substantiating it findings

regarding each factor or explaining how the factors prevent a proper comparison.  As

---

[15] Commerce also cites a similar KFTC decision regarding allegations of bid rigging
dating back to the 1990's.  See Final Decision Memo at 18 (citing, inter alia, PMS
Allegation at Ex. 35).

such, Commerce's determination is unreasonable and must be remanded for further explanation or reconsideration.

## 2. Profit and Selling Expense Information

SeAH submits that Commerce must use its third country sales data to calculate CV profit and selling expenses.  SeAH's Br. at 43–46.  NEXTEEL similarly requests Commerce use its own profit information when calculating constructed value.  NEXTEEL's Br. at 39–40.  Alternatively, SeAH and NEXTEEL insist that Commerce use contemporaneous financial statements, instead of using Hyundai's profit and selling expense information from the first administrative review.  See SeAH's Br. at 46–47; NEXTEEL's Br. at 40.  Should Commerce continue to rely on Hyundai's data, SeAH and NEXTEEL request Commerce do so under the statutory "profit cap" provision.  See SeAH's Br. at 47–48; NEXTEEL's Br. at 40–41. Defendant argues that Commerce reasonably determines that Hyundai's information is the best source of profit and selling expense data, and that Commerce reasonably decided not to apply the statutory profit cap provision.  See Def.'s Br. at 56–61.  Defendant-Intervenors Maverick and IPSCO Tubulars add that Commerce found that Hyundai's profit and selling expense information would serve as the only reasonable profit cap. See Maverick & IPSCO Tubulars' Br. at 34–35.  For the reasons that follow, Commerce's determination is remanded.

When determining expenses for constructed value, the statue provides that Commerce shall use:

> the actual amounts incurred and realized by the specific exporter or
> producer being examined in the investigation or review for selling,
> general, and administrative expenses, and for profits, in connection
> with the production and sale of a foreign like product, in the ordinary
> course of trade, for consumption in the foreign country[.]

19 U.S.C. § 1677b(e)(2)(A).  If actual data on amounts for selling expenses, G&A

expenses, and for profits, referenced in § 1677b(e)(2)(A), are not available, then

§ 1677b(e)(2)(B) provides three alternatives:

> (i) the actual amounts incurred and realized by the specific exporter or
> producer being examined in the . . . review . . . in connection with the
> production and sale . . . of merchandise that is in the same general
> category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by
> exporters or producers that are subject to the . . . review . . .

> (iii) the amounts incurred and realized . . . based on any other
> reasonable method, except that the amount allowed for profit may not
> exceed the amount normally realized by exporters or producers[.]

Id. at § 1677b(e)(2)(B).

Here, Commerce rejects record evidence of "actual [profit and selling expenses]

incurred and realized" by NEXTEEL and SeAH under 19 U.S.C. § 1677b(e)(2)(A),

(B)(i).  Commerce observes that NEXTEEL's home market sales are unreliable

because they relate to below-cost transactions, and that SeAH's sales into the

Canadian market are unreliable because they are not representative.  See Final

Decision Memo at 31–33.

Commerce relies instead on Hyundai's CV profit ratio and selling expense

information from the first administrative review under 19 U.S.C. § 1677b(e)(2)(B)(ii)

because Hyundai's information specifically relates to the production of WLP in Korea (i.e., the information is product and country specific).[16]   Commerce declines to use contemporaneous financial statements of Korean and non-Korean producers pursuant to alternatives (i) or (iii), observing that the statements are incomplete and less specific to the subject merchandise than Hyundai's CV profit ratio and selling expense information, respectively.   See Final Decision Memo at 34–36. Acknowledging SeAH's and NEXTEEL's contentions that Hyundai's CV profit ratio and selling expense information is not contemporaneous, Commerce nonetheless explains that Hyundai's information is the best and most accurate information available on the record.[17]   Final Decision Memo at 34 ("We continue to find that,

---

[16] Commerce explains:

> In conducting this analysis, we note that the specific language of both the preferred and alternative methods appear to show a preference that the profit and selling expenses reflect: 1) production and sales in the foreign country; and 2) the foreign like product, i.e., the merchandise under consideration.

Final Decision Memo at 33.

[17] SeAH contests Commerce's decision to reject the proffered financial statements as incomplete, arguing that no statute or regulation requires that surrogate financial statements be complete.  See SeAH's Br. at 46.  Commerce specifically indicated to the respondents that any surrogate financial statement submitted must be complete. Final Decision Memo at 35 (citing Request for CV Profit & Selling Expense Cmts. & Info., PD 128, bar code 3733367-01 (July 19, 2018)).  It would not be unreasonable for Commerce to find such sources unreliable because it could not be certain of what the missing information revealed.  See Final Decision Memo at 36.  However, because the court is remanding Commerce's reliance on 19 U.S.C. § 1677b(e)(2)(B)(ii), as well as its refusal to consider SeAH's sales to Canada under § 1677b(e)(2)(A)–(B), the court does not reach the issue of whether Hyundai's information is the only reliable source under 19 U.S.C. § 1677b(e)(2)(B)(iii).

absent specific evidence of significant differences in market conditions during the two

time periods, the specificity of the data outweighs concerns over contemporaneity.").

As a preliminary matter, Commerce's invocation of 19 U.S.C.

§ 1677b(e)(2)(B)(ii) to use Hyundai's CV profit ratio and selling expense information

is contrary to law.  Under § 1677b(e)(2)(B)(ii), Commerce must rely on the "weighted

average of the actual amounts incurred and realized by exporters or producers that

are subject to the investigation or review[.]"  Hyundai's CV profit ratio and selling

expense information are from the first administrative review, not this one.

To the extent that Commerce alternatively relies on "[Hyundai's] information

from the first review . . . as the only reasonable profit cap" under 19 U.S.C.

§ 1677b(e)(2)(B)(iii), Commerce's determination is also unsupported by substantial

evidence.  See Final Decision Memo at 36.  It is reasonably discernible that Commerce

considers Hyundai's CV profit ratio and selling expense information to be the only

reasonable source for determining a profit cap under 19 U.S.C. § 1677b(e)(2)(B)(iii).

See id. ("Hyundai Steel's prior CV profit information for sale of WLP in its home

market is the best data to be used as a 'facts available' profit cap, because it is specific

to WLP and represents the production experience of a Korean WLP producer in

Korea.")  However, Commerce's refusal to consider SeAH's sales to Canada as a

source for calculating CV profit and selling expense information under section

1677b(e)(2)(A) or 1677b(e)(2)(B) rests on its finding that those sales are not

representative.  See id. at 32.  Because the court is remanding Commerce's finding

that SeAH's sales into Canada are not representative,[18] Commerce must also further explain or reconsider its reliance on Hyundai's CV profit ratio and selling expense information from the first administrative review as the profit cap under 19 U.S.C. § 1677b(e)(2)(B)(iii).

### 3. NEXTEEL's Non-Prime WLP Products

NEXTEEL argues that Commerce's methodology for classifying and treating certain sales of WLP as non-prime in this proceeding contradicts agency practice. See NEXTEEL's Br. at 41–43. Defendant counters that Commerce's methodology is consistent with agency precedent and maintains that Commerce's determination is reasonable. For the reasons that follow, Commerce's deduction to NEXTEEL's constructed value to account for sales of non-prime products is remanded.

---

[18] Even if Commerce continues to find that SeAH's sales to Canada are not representative, it must reconcile its refusal to consider SeAH's third country sales with its treatment of SeAH's sales to Canada in OCTG from Korea. Certain Oil Country Tubular Goods from the Republic of Korea, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of [ADD] duty admin. review; 2014-2015) ("OCTG from Korea 2014-2015") and accompanying Issues and Decision Memo. for [OCTG from Korea 2014-2015] at Cmt. 34, A-580-870, (Apr. 10, 2017), available at https://enforcement.trade.gov/frn/summary/korea-south/2017-07684-1.pdf (last visited Aug. 7, 2020) ("OCTG from Korea 2014-2015 IDM"). Commerce explains "that basing CV profit on SeAH's sales to Canada [in OCTG from Korea 2014-2015] was the appropriate methodology for that review based on the specific facts of that case[,]" but does not state what those facts are, or why the facts of this case are distinguishable. See Final Decision Memo at 32–33. In both cases, SeAH's sales into Canada were the subject of dumping proceedings, yet Commerce used SeAH's above-cost sales to calculate CV profit in OCTG from Korea while refusing to consider SeAH's sales in this instance. Compare id. with OCTG from Korea 2014-2015 IDM at 13–14. Commerce must explain what "specific facts" justify its departure from its previous methodology.

When determining the constructed value of the subject merchandise, Commerce shall normally calculate costs based on the records of the respondent under investigation or review.  See 19 U.S.C. § 1677b(f)(1)(A).  However, Commerce sometimes finds that a portion of those costs relate to the production of "non-prime" products.  See, e.g., Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1381 (Fed. Cir. 2008) ("Mittal Steel").  Commerce classifies a product as "non-prime" when it finds that the product is downgraded so "significantly that it no longer belongs to the same group and cannot be used for the same applications as the prime product."  Final Decision Memo at 42; see also, e.g., Mittal Steel, 548 F.3d at 1381. According to Commerce, the market value of non-prime products drops to such an extent that the full costs of producing the product cannot be recovered when sold.  See Final Decision Memo at 42.   Because the full costs of such products cannot be recovered when sold (i.e., sold at a loss), Commerce views it unreasonable to account for the full costs of non-prime products when determining constructed value of sales of the subject merchandise (i.e., prime products).  See id.; see also 19 U.S.C. § 1677(16)(A); Mittal Steel, 548 F.3d at 1381 (citations omitted).  Under such circumstances, Commerce's practice is to lower the reported total value of prime products by the difference between reported costs of the non-prime products and the selling price of the non-prime products.  See Final Decision Memo at 42–43. Commerce states that its practice is to assess whether a product is "non-prime" on a case-by-case basis, considering factors such as (1) how the products are treated in the

respondent's normal books and records, (2) whether they remain in scope, and (3) whether they can still be used in the same applications as the prime subject merchandise.  See id. at 42.

Commerce fails to fully explain how its determination here accords with its stated practice, given the record evidence and agency precedent, and further, why that practice is reasonable.  Commerce determines that some of NEXTEEL's reported WLP sales relate to "non-prime" products, reasoning that these products are downgraded to such an extent that they cannot be put toward the same applications as their "prime" counterparts.  See Final Decision Memo at 42–43.  Despite NEXTEEL's contention that Commerce has assigned full costs to downgraded line pipe products in the past, Commerce adjusts "NEXTEEL's reported costs to value the downgraded non-prime products at their sales price," and "allocat[es] the difference between the full production cost and market value of the non-prime products to the production costs of prime-quality WLP."  Final Decision Memo at 43 (citations omitted).  In doing so, Commerce takes into account only one of the three considerations it says it relies on to determine how to classify and account for "non-prime" products.  Commerce focuses on its finding that non-prime WLP cannot be put toward the same applications as prime WLP, but does not consider how those products "are treated in [NEXTEEL's] normal books and records" and "whether [the products] remain in scope."  See Final Decision Memo at 42–43.  Commerce's criteria

for classifying and valuing non-prime merchandise are conjoined by the word "and",

which suggests that Commerce typically considers all three criteria. See id. at 42.

Commerce seems to imply that its consideration as to whether the product can

be put to the same application as prime product is dispositive, yet the precedent it

invokes to evidence its practice suggests otherwise. For example Steel Concrete

Reinforcing Bar from Mexico, Commerce addresses whether the respondent was

justified in "its departure from its normal books and records" and whether the non-

prime product was "reportable merchandise." See, e.g., Steel Concrete Reinforcing

Bar From Mexico, 82 Fed. Reg. 27,233 (Dep't Commerce June 14, 2017) (final results

of [ADD] admin. review; 2014–2015) ("Rebar from Mexico") and accompanying Issues

and Decision Memo. for [Rebar from Mexico] at Cmt. 3, A-201-844, (June 7, 2017)

available at   https://enforcement.trade.gov/frn/summary/mexico/2017-12304-1.pdf

(last visited Aug. 18, 2020)); see also Final Decision Memo at 42 n.195.

Moreover, in OCTG from Ukraine, Commerce considered whether a

respondent's sales of "reject" merchandise were properly within the scope of the ADD

investigation. See OCTG from Ukraine IDM at 8–11. After analyzing the scope of

the investigation, Commerce concluded that the reject merchandise remained within

scope as non-prime products, and included those sales in its calculation of the

dumping margin. See id. If the products at issue here are not within the scope of the

ADD order, then Commerce should explain why the cost associated with their

manufacture would be relevant to calculation of NEXTEEL's dumping margin. On

remand, Commerce must clarify its practice, explain why its practice is reasonable and how its determination in this case accords with its practice in light of the record evidence.  Accordingly, the court remands Commerce's determination.

### 4.  Reclassification of NEXTEEL's Costs from Suspended Production

NEXTEEL argues that Commerce errs by reallocating costs related to the suspended production of certain product lines from cost of goods sold assigned to those products specifically to G&A expenses, and challenges Commerce's resultant adjustment to NEXTEEL's reported G&A expense ratio for WLP.  See NEXTEEL's Br. at 43–44.  Defendant counters that NEXTEEL merely disagrees with Commerce's finding but does not demonstrate that Commerce's determination is unreasonable. See Def.'s Br. at 63–65.  Defendant-Intervenors Maverick and IPSCO Tubulars add that Commerce's determination accords with agency practice.   See Maverick & IPSCO Tubulars' Br. at 37–39.  For the following reasons, Commerce's determination is remanded.

When determining constructed value, Commerce "shall normally [calculate selling expenses, G&A expenses, and profit] based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  Here, Commerce explains that it accounts for expenses associated with extended shutdowns of production lines

as costs relating to the general operations of the company as a whole, and includes

those losses as part of a respondent's G&A expenses.[19]  See Final Decision Memo at

44–45 & n.210 (citing Certain Oil Country Tubular Goods from the Republic of Korea,

82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of [ADD] duty

admin. review; 2014-2015) ("OCTG from Korea 2014-2015") and accompanying Issues

and Decision Memo. for [OCTG from Korea 2014-2015] at Cmt. 34, A-580-870, (Apr.

10, 2017), available at https://enforcement.trade.gov/frn/summary/korea-south/2017-

07684-1.pdf (last visited Aug. 17, 2020) ("OCTG from Korea 2014-2015 IDM").

Specifically, Commerce explains that it reallocates the losses associated with the

extended suspension of a respondent's production line because, "once a production

line is suspended, it no longer relates to ongoing production [of the specific product]."

Final Decision Memo at 44.  According to Commerce, companies suspend product

lines for numerous reasons, and whatever the reason for the shutdown, "products are

not produced on those production lines to recover the costs associated with those

production lines."  Id.   Nonetheless, Commerce does not address NEXTEEL's

argument that Commerce's practice of reallocating its losses contravenes the plain

requirements of 19 U.S.C. § 1677b(f)(1)(A) in this instance.  As such, the court must

remand Commerce's determination for further explanation or reconsideration.

---

[19] Commerce notes that its normal practice is to "to include routine shutdown expenses (i.e., maintenance shutdowns) in a respondent's reported costs and to associate them to the products produced on those lines."  Final Decision Memo at 44 (citing Gray Portland Cement and Clinker From Mexico, 62 Fed. Reg. 17,148, 17,159–17,160 (Dep't Commerce Apr. 9, 1997) (final results of [ADD] admin. review)).

30

**5.  Use of SeAH's Average Costs for the Review Period**

SeAH argues that Commerce's refusal to calculate its costs based on quarterly averages is unreasonable and contrary to agency practice.  See SeAH's Br. at 33–36. Defendant submits that Commerce's decision use average costs for the review period (i.e., annual weighted averages) is reasonable and consistent with agency practice. See Def.'s Br. at 65–67.  For the reasons that follow, Commerce's determination is remanded.

When determining constructed value, Commerce usually relies on the weighted average of costs incurred throughout the entire POR (i.e., annual costs). See Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/[POR] that May Require Using Shorter Cost Averaging Periods, 73 Fed. Reg. 26,364, 26,365 (Dep't Commerce May 9, 2008) (request for comment).  Nonetheless, Commerce deviates from its standard methodology when it determines that there are significant changes in costs during the POR.  See id.; see also Final Decision Memo at 55 (citing Steel Concrete Reinforcing Bar From Taiwan, 82 Fed. Reg. 34,925 (Dep't Commerce July 27, 2017) (final determination of sales at less than fair value) ("Rebar from Taiwan") and accompanying Issues and Decision Memo. for the [Rebar from Taiwan] at Cmt. 2, A-583-859,           (July           20,           2017),           available           at https://enforcement.trade.gov/frn/summary/taiwan/2017-15840-1.pdf   (last   visited Aug. 17, 2020) ("Rebar from Taiwan IDM").  In such instances, Commerce instead

relies on quarterly average costs, provided that there is a linkage (i.e., reasonable correlation) between costs and sales information during the shorter averaging periods.  See Rebar from Taiwan IDM at Cmt. 2; see also Final Decision Memo at 55.

Commerce explains that although SeAH's reported cost fluctuations during the POR were "significant", the data does not demonstrate that sales prices and costs were linked.  See Final Decision Memo at 55–57.  Specifically, Commerce observes that "the magnitude of the changes in the quarterly costs and sales prices of WLP were not comparable and the quarterly prices and costs did not trend consistently for all the CONNUMs tested."  Id. at 56.   However, the costs and prices between first and second quarters—i.e., the only period during which SeAH experienced a magnitude of fluctuation in costs that satisfied Commerce's criteria for determining "significance"—do appear to be reasonably correlated.   See SeAH's Suppl. Questionnaire Resp. at Attachment SD-5, PD 145–146, CD 151–167, bar codes 3738658-01–02, 3738614-01–17 (Aug. 3, 2018) (showing an increase in cost and price from the first to second quarters).  Nonetheless, Commerce finds, "that the quarterly prices and costs of WLP do not appear to be reasonably correlated and that linkage does not exist."  Final Decision Memo at 56.  It is not discernible from Commerce's analysis whether it notes the correlation of prices and costs between the first and second quarters, but finds that the linkage requirement is not satisfied nonetheless (e.g., because Commerce examines whether costs and prices are linked across the entire POR), whether it mistakenly overlooked the correlation, or whether Commerce

finds that SeAH's prices and costs are not reasonably correlated for some other reason. Should Commerce continue to rely on constructed value to determine the normal value of SeAH's sales, it must either reconsider its use of the annual weighted averages to calculate SeAH's costs, or explain its continued reliance on annual averages despite the fact that SeAH's prices and costs appear to be correlated during the period of time between the first and second quarters.

## III. Allocation of G&A Expenses when Calculating Constructed Export Price

SeAH argues that Commerce erred by deducting from its constructed export price certain G&A expenses incurred by PPA, its affiliate U.S. reseller, as selling expenses. <u>See</u> SeAH's Br. at 37–42. Defendant counters that Commerce has discretion to apply PPA's G&A expenses to both further manufactured and non-further manufactured products, and that Commerce reasonably allocated those expenses when adjusting SeAH's constructed export price. <u>See</u> Def.'s Br. at 49–55. For the following reasons, Commerce's determination is remanded.

As explained, when reviewing an ADD order, Commerce calculates dumping margins by comparing the normal value of the merchandise to its export price—here, constructed export price. <u>See</u> 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C); <u>see also</u> <u>id.</u> at §§ 1677(35), 1677a. Commerce uses constructed export price to determine the dumping margin when the producer or exporter of the subject merchandise sells to an affiliated buyer. <u>See</u> 19 U.S.C. § 1677a(b). The constructed export price is the price at which the subject merchandise is first sold to the affiliated buyer as adjusted

under subsections (c) and (d).  <u>See</u> <u>id.</u> at § 1677a(b).  Relevant here, subsection (d)(1) requires Commerce to deduct various selling expenses from the constructed export price, and subsection (d)(2) requires Commerce to deduct costs of further manufacture or assembly from the constructed export price.  <u>See</u> <u>id.</u> at § 1677a(d).  Pursuant to 19 U.S.C. § 1677a(d)(1)(D), Commerce normally calculates, and deducts from the constructed export price, indirect selling expenses.

Commerce describes at length its methodology for determining PPA's G&A expense ratio, but neither clarifies whether it is treating PPA's G&A expenses as indirect selling expenses, nor explains why it is authorized to do so under the statute. <u>See</u> Final Decision Memo 58–61.  Instead, Commerce frames the issue as "how to properly account for the G&A expenses that have been allocated over the full cost of the products sold[,]" explaining that Commerce's approach accords with agency practice and is a "balanced and reasonable" way to assign PPA's G&A expenses to both resold and further manufactured products.  <u>See</u> <u>id.</u> at 59–60 (citations omitted). In doing so, Commerce dismisses SeAH's request to apply the G&A expense ratio only to PPA's costs of further manufacturing, explaining that "[a]pplying such a ratio to only the cost of further manufacturing would result in a mismatch between the figures used in the G&A expense ratio calculation[.]"  <u>Id.</u> at 60.  However, bare assertions about what is "proper" or "balanced" as a matter of accounting say nothing of what is authorized and reasonable under the statute.  Accordingly, Commerce's determination is remanded for further explanation as to whether it is treating PPA's

G&A expenses as indirect selling expenses under the statute, and if so, why it is so authorized, or for reconsideration.

## IV.     Calculation of Non-Examined Rate

Husteel adopts and incorporates by reference NEXTEEL and SeAH's challenges to Commerce's calculation of the dumping margin, and requests "in addition to the recalculation of the all-others rate to remove the distortive total AFA rate, any other relief granted by the Court and resulting adjustment to the individual weighted average dumping margins for NEXTEEL and SeAH be incorporated into the revised average dumping margin applied to Husteel." Husteel's Br. at 31–32.[20]

Commerce normally calculates the non-examined company's rate, or "all others rate," as the "weighted average of the estimated weighted average dumping margins established for exporters and producers individually examined, excluding, in pertinent part, any margins determined entirely on the basis of facts otherwise available." 19 U.S.C. § 1673d(c)(5)(A).[21] Because the court is remanding Commerce's determination of normal value for the mandatory respondents, Commerce must

---

[20] Husteel argued that Commerce impermissibly used an AFA CVD rate from a previous proceeding to calculate the non-examined company's rate for cooperative respondents in this proceeding. See Husteel's Br. at 28–31. Husteel now concedes that Commerce did not base the non-examined rate "entirely" on the AFA CVD rate assigned to POSCO in Hot-Rolled Steel from Korea CVD, 19 U.S.C. § 1673d(c)(5)(A), but rather, used the AFA CVD rate as a component of constructed value when calculating NEXTEEL's and SeAH's dumping margins. See Oral Arg. at 2:11:20–2:13:40, June 25, 2020, ECF No. 79.

[21] The Court of Appeals for the Federal Circuit has clarified that the methods under 19 U.S.C. § 1673d apply to administrative reviews as well as investigations. See Albemarle Corp. v. United States, 821 F.3d 1345, 1352–53 (Fed. Cir. 2016).

recalculate the non-examined company's rate as appropriate to reflect any adjustments to its calculation of the dumping margins for NEXTEEL and SeAH.

## CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's determination is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing of its remand redetermination.

          /s/ Claire R. Kelly
          Claire R. Kelly, Judge

Dated:      August 26, 2020
            New York, New York