Slip Op. 21-70

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HUSTEEL CO., LTD., <br><br>     Plaintiff, <br><br> and <br><br> NEXTEEL CO., LTD. ET AL., <br><br>     Consolidated Plaintiffs, <br><br> v. <br><br> UNITED STATES <br><br>     Defendant, <br><br> and <br><br> MAVERICK TUBE CORPORATION ET AL., <br><br>     Defendant-Intervenors and Consolidated Defendant-Intervenors. | Before: Claire R. Kelly, Judge <br><br> Consol. Court No. 19-00112 <br> PUBLIC VERSION |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's corrected remand redetermination in the 2016–2017 administrative review of the antidumping duty order on welded line pipe from the Republic of Korea.]

Dated: June 7, 2021

Donald B. Cameron, Morris, Manning & Martin LLP, of Washington, DC, for plaintiff Husteel Co., Ltd.  Also on the brief were Brady W. Mills, Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, and Eugene Degnan.

Consol. Court No. 19-00112                                                      Page 2
**PUBLIC VERSION**

<u>J. David Park</u>, Arnold & Porter Kaye Scholer LLP, of Washington, DC, for consolidated plaintiffs Hyundai Steel Company and NEXTEEL Co., Ltd.  Also on the briefs were <u>Henry D. Almond</u>, <u>Daniel R. Wilson</u>, <u>Leslie C. Bailey</u>, and <u>Kang Woo Lee</u>.

<u>Jeffrey M. Winton</u>, Winton & Chapman PLLC, of Washington, DC, for consolidated plaintiff SeAH Steel Corporation.  Also on the briefs was <u>Amrietha Nellan</u>.

<u>Robert R. Kiepura</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  Also on the brief were <u>Bryan M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director. Of Counsel was <u>Reza Karamloo</u>, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Elizabeth J. Drake</u>, <u>Roger B. Schagrin</u>, <u>Christopher T. Cloutier</u>, and <u>Luke A. Meisner</u>, Schagrin Associates, of Washington, DC, for defendant-intervenors California Steel Industries and Welspun Tubular LLC USA.

<u>Gregory J. Spak,</u> White & Case, LLP, of Washington, DC, for defendant-intervenors Maverick Tube Corporation and IPSCO Tubulars Inc.  Also on the briefs were <u>Frank J. Schweitzer</u>, <u>Kristina Zissis</u>, and <u>Matthew W. Solomon</u>.

      Kelly, Judge:   Before the court is the U.S. Department of Commerce's ("Commerce") remand redetermination in the 2016–2017 administrative review of the antidumping duty ("ADD") order on welded line pipe ("WLP") from the Republic of Korea ("Korea") filed pursuant to the court's remand order in <u>Husteel Co. v. United States</u>, as later corrected pursuant to the court's order granting Commerce's request for a remand.  <u>See</u> 44 CIT __, __, 471 F. Supp. 3d 1349, 1371 (2020) ("<u>Husteel</u>"); Final Results of Redetermination Pursuant to Ct. Remand, Jan. 8, 2021, ECF No. 84 ("<u>Remand Results</u>"); <u>see also</u> Order, Jan. 15, 2021, ECF No. 87 ("Remand Order") (granting Defendant's request for an expedited remand to correct a clerical error);

Corrected Final Results of Redetermination Pursuant to Ct. Remand, Jan. 22, 2021,

ECF No. 88 ("Corrected Remand Results").

    In Husteel, the court remanded Commerce's decision to reject SeAH Steel

Corporation's ("SeAH") third country sales (into Canada) and instead to calculate the

normal value of SeAH's subject WLP based on constructed value.  See 44 CIT at __,

471 F. Supp. 3d at 1359–61.  Moreover, with respect to Commerce's methodology for

calculating the constructed value of SeAH's and NEXTEEL Co. Ltd.'s ("NEXTEEL")

subject WLP, the court remanded for further explanation or reconsideration:

Commerce's finding that a particular market situation ("PMS") in Korea distorted the

cost of producing WLP during the period of review ("POR"), see id. at __, 471 F. Supp.

3d at 1361–64; Commerce's reliance on Hyundai Steel Company's ("Hyundai")

constructed value profit ratio ("CV profit ratio") and selling expenses from the first

administrative review to construct profit and selling expenses associated with SeAH's

and NEXTEEL's foreign market sales during this administrative review, as well as

Commerce's decision to establish Hyundai's information as the only reasonable profit

cap pursuant to section 773(e)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19

U.S.C. § 1677b(e)(2)(B)(iii) (2018),[1]  see Husteel, 44 CIT at __, 471 F. Supp. 3d at

1364–66; Commerce's reallocation of costs reported by NEXTEEL associated with the

sale of non-prime products and resultant deduction to NEXTEEL's constructed value,

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2018 edition.

see id. at __, 471 F. Supp. 3d at 1366–67; Commerce's reallocation of costs reported by NEXTEEL associated with the suspension of certain product lines from cost of goods sold assigned to those products specifically to general and administrative ("G&A") expenses, and resultant adjustment to NEXTEEL's reported G&A expense ratio for WLP, see id. at __, 471 F. Supp. 3d at 1367–68; and Commerce's decision to use annual weighted-averages for the review period to calculate SeAH's costs. See id. at __, 471 F. Supp. 3d at 1368–69. With respect to its calculation of the export price (here, constructed export price) of SeAH's U.S. sales, the court remanded for further explanation or reconsideration Commerce's decision to deduct certain G&A expenses incurred by SeAH's U.S. sales affiliate Pusan Pipe America ("PPA"). See id. at __, 471 F. Supp. 3d at 1369–70. The court instructed Commerce to recalculate the non-examined company's rate applicable to Husteel Co., Ltd. ("Husteel") as appropriate to reflect any adjustments to its calculation of NEXTEEL's and SeAH's dumping margin. Id. at __, 471 F. Supp. 3d at 1370–71.

On remand, Commerce, under respectful protest,[2] reverses its decision to disregard SeAH's sales of WLP into Canada and uses those sales to determine the normal value of SeAH's entries. See Remand Results at 2, 22–23. Also under respectful protest, Commerce reverses its finding that a PMS in Korea distorted the cost of producing WLP during the POR, see id. at 2, 23–24, and uses SeAH's sales

---

[2] By adopting a position "under protest," Commerce preserves its right to appeal. See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

into Canada as the basis for constructing NEXTEEL's profit and selling expenses.

See id. at 2, 24–25.   However, Commerce further explains its decision to adjust NEXTEEL's constructed value to account for losses associated with the sale of non-prime WLP products, as well as its decision to reclassify NEXTEEL's reported losses relating to the suspension of certain product lines.   See id. at 2, 9–13, 31–36. Commerce also further explains its decision to use an annual weighted-average of costs during the review period to calculate SeAH's costs.   See id. at 13–17, 25–27. Lastly, Commerce further explains its decision to deduct certain G&A expenses incurred by PPA from SeAH's constructed export price.   See id. at 17–21.   For the following reasons, Commerce's remand redetermination is sustained in part and remanded in part.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its previous opinion ordering remand to Commerce, and now recounts those relevant to the court's review of Commerce's remand redetermination.   See Husteel, 44 CIT at __, 471 F. Supp. 3d at 1357–59.   On August 10, 2018, Commerce published the amended final results of its 2016–2017 administrative review of the ADD order covering WLP from Korea, spanning a period of review from December 1, 2016 through November 30, 2017.   See Welded Line Pipe From the Republic of Korea, 84 Fed. Reg. 27,762, 27,762 (Dep't Commerce June 14, 2019) (final results of [ADD] admin. review and final determination of no shipments; 2016–2017) ("Final Results")

as amended by 84 Fed. Reg. 35,371 (Dep't Commerce July 23, 2019) (amended final results of [ADD] admin. review; 2016–2017) ("Amended Final Results") and accompanying Issues and Decision Memo., A-580-876, (June 7, 2019), ECF No. 36-5 ("Final Decision Memo").  Commerce assigned rates of 38.87 percent for NEXTEEL, 22.70 percent for SeAH, and 29.89 percent for non-selected respondents.  See Amended Final Results, 84 Fed. Reg. at 35,372.   Pursuant to U.S. Court of International Trade Rule 56.2, Husteel, SeAH, NEXTEEL, and Hyundai brought this consolidated action challenging various aspects of Commerce's final determination.  See Pl. [Husteel]'s Mot. J. Agency R., Dec. 18, 2019, ECF No. 46; [Consol. Pl. SeAH]'s Mot. J. Agency R., Dec. 18, 2019, ECF No. 41; Consol. Pl. [NEXTEEL]'s 56.2 Mot. J. Agency R., Dec. 18, 2019, ECF No. 44; Consol. Pl. [Hyundai]'s 56.2 Mot. J. Agency R., Dec. 18, 2019, ECF No. 45.

In Husteel, the court remanded Commerce's final determination for further explanation or reconsideration.  See 44 CIT at __, 471 F. Supp. 3d at 1371.  The court held that Commerce's decision to disregard SeAH's sales of WLP into Canada was unsupported by substantial evidence because Commerce relied solely on findings of the Canadian International Trade Tribunal ("CITT") to determine that SeAH's sales into Canada were unrepresentative, without addressing detracting evidence illustrating material differences between antidumping law in the U.S. and Canada.  See id. at __, 471 F. Supp. 3d at 1359–61.  The court also found wanting several

aspects of Commerce's methodology for calculating the constructed value of SeAH's

and NEXTEEL's entries of subject WLP.

Namely, the court held that Commerce did not support with substantial

evidence its determination that global steel overcapacity, domestic subsidies,

strategic alliances between manufacturers, and government involvement in the

electricity market cumulatively created a PMS that distorted the cost of hot-rolled

coil ("HRC")—a primary input in the manufacture of subject WLP—such that

Commerce was prevented from conducting a proper comparison between the normal

value and U.S. price of respondents' entries of subject WLP during the POR.  See id.

at __, 471 F. Supp. 3d at 1361–64.  The court also observed that Commerce's

calculation of NEXTEEL's and SeAH's profit and selling expenses erred in two

respects.  First, the court held that Commerce's invocation of 19 U.S.C.

§ 1677b(e)(2)(B)(ii) as the basis for resorting to Hyundai's CV profit ratio and selling

expense information from the first administrative review of the ADD order on subject

WLP is contrary to law because § 1677b(e)(2)(B)(ii) requires Commerce to use a

"weighted average of the actual amounts incurred and realized by exporters or

producers that are subject to the investigation or review[.]"  Husteel, 44 CIT at __,

471 F. Supp. 3d at 1365 (quoting 19 U.S.C. § 1677b(e)(2)(B)(ii)).  Second, to the extent

that Commerce relied on 19 U.S.C. § 1677b(e)(2)(B)(iii) to establish Hyundai's profit

and selling expense information as the only reasonable profit cap, the court held that

Commerce's determination was unsupported by substantial evidence; given its

decision to disregard SeAH's third country sales as unrepresentative, Commerce's

profit cap determination did not contemplate those third country sales as an

alternative source of profit and selling expense information.  See Husteel, 44 CIT at

__, 471 F. Supp. 3d at 1365–66 (citing 19 U.S.C. § 1677b(e)(2)(B)(iii)).  Moreover, the

court deemed inadequate Commerce's explanation as to how its decision to reallocate

costs reported by NEXTEEL to reflect losses realized on the sale of non-prime WLP

products comports with agency practice, and how that practice was reasonable under

the statute.  See id. at __, 471 F. Supp. 3d at 1366–67.  Finally, the court observed

that it was unclear whether Commerce's justification for using weighted-average

costs spanning the review period (i.e., annual costs) to calculate SeAH's costs during

the POR in light of purported cost-fluctuations, instead of its quarterly pricing

methodology, took into account the apparent correlation in SeAH's prices and costs

between the first and second quarters—the period during which SeAH purportedly

experienced significant cost-fluctuations.  See id. at __, 471 F. Supp. 3d at 1368–69.

Regarding calculation of SeAH's constructed export price, the court held that

Commerce's final determination neither clarified why Commerce is treating PPA's

G&A expenses as indirect selling expenses, nor explained why doing so is reasonable

such that Commerce may deduct the expense under 19 U.S.C.

§ 1677a(d)(1)(D).  See Husteel, 44 CIT at __, 471 F. Supp. 3d at 1369–70.  The court

instructed Commerce to "recalculate the non-examined company's rate as

appropriate to reflect any adjustments to its calculation of the dumping margins for

NEXTEEL and SeAH." Id. at __, 471 F. Supp. 3d at 1370–71.

On December 7, 2020, NEXTEEL filed a notice of supplemental authority,

apprising the court and the parties of the Court of Appeals for the Federal Circuit's

("Court of Appeals") decision in Dillinger France S.A. v. United States, 981 F.3d 1318

(Fed. Cir. 2020) ("Dillinger").  On January 8, 2021, Commerce filed the final results

of its remand redetermination.  See generally Remand Results.  On January 14, 2021,

Defendant moved for a remand in order to correct a clerical error resulting from

Commerce's inadvertent failure to update NEXTEEL's constructed value selling

expense and profit calculations.  See Def.'s Mot. for Expedited Remand, Jan. 14, 2021,

ECF No. 85.  Notwithstanding SeAH's objection to the amount of time requested by

counsel for Defendant, see Resp. to Def.'s Mot. for Remand, Jan. 15, 2021, ECF No.

86, the court granted the motion.  See generally Remand Order.  On January 22,

2021, Commerce filed the final results of its second remand redetermination, stating

that it corrected NEXTEEL's margin calculation to reflect its decision to use SeAH's

third country sales as the basis for NEXTEEL's profit and selling expenses.  See

generally Corrected Remand Results.

On February 22, 2021, the parties submitted their comments on the final

results of Commerce's corrected remand redetermination.  See [SeAH's] Cmts. [on

Remand Results] Confidential Version, Feb. 22, 2021, ECF No. 91 ("SeAH's Br.");

Maverick Tube Corporation & IPSCO Tubulars Inc.'s Cmts. on [Remand Results],

Feb. 22, 2021, ECF No. 93 ("Def-Intervenors' Br."); [NEXTEEL's] Remand Cmts., Feb.

22, 2021, ECF No. 94 ("NEXTEEL's Br.").  On March 24, 2021, the parties filed their

respective replies to comments submitted on Commerce's remand redetermination.

Reply Cmts. of [SeAH] to [Def-Intervenors' Br.], Mar. 24, 2021, ECF No. 97 ("SeAH's

Reply Br."); NEXTEEL's Reply to [Def-Intervenors' Br.], Mar. 24, 2021, ECF No. 99

("NEXTEEL's Reply Br."); Maverick Tube Corporation & ISPCO Tubulars, Inc.'s

Reply Cmts. on [Remand Results], Mar. 24, 2021, ECF No. 100; Def.'s Resp. to Cmts.

on [Remand Results], Mar. 24, 2021, ECF No. 98 ("Def.'s Resp. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28

U.S.C. § 1581(c) (2018), which grant the court authority to review actions contesting

the final determination in an administrative review of an ADD order.  The court will

uphold Commerce's determination unless it is "unsupported by substantial evidence

on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

"The results of a redetermination pursuant to court remand are also reviewed 'for

compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v.

United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai

Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306

(2008)).

## DISCUSSION

### I.    SeAH's Third Country Sales

Defendant-Intervenors Maverick Tube Corporation and ISPCO Tubulars, Inc. (collectively, "Tenaris USA") contend that Commerce's reversal of its finding that SeAH's third country sales into Canada are unrepresentative is unreasonable.  See Def-Intervenors' Br. at 3–9.  In Tenaris USA's view, Commerce should have further explained its prior finding that SeAH's third country sales are unrepresentative in light of the court's remand order in Husteel.  See id.  Defendant and SeAH counter that Commerce reasonably explained that there was no record evidence that would allow it to address detracting evidence regarding material inconsistencies between U.S. and Canadian antidumping law.  See Def.'s Resp. Br. at 4–6; SeAH's Reply Br. at 3–4.  For the following reasons, Commerce's determination is sustained.

Where Commerce finds that home market sales are an inappropriate basis for determining normal value, it may instead use third country sales.  See 19 U.S.C. § 1677b(a)(1).  Commerce may only rely on third country sales where the "prices [for those sales are] representative," where the aggregate quantity of sales are at a sufficient level, and where Commerce does not determine that a PMS prevents a proper comparison between the export price, or constructed export price, and the third country price.  See 19 U.S.C. § 1677b(a)(1)(B)(ii).  The statute does not define what it means for prices to be representative, but Commerce's regulations and regulatory history reveal that where the aggregate quantity of third country sales are

at a sufficient level, those sales are presumptively representative unless demonstrated otherwise. <u>See</u> 19 C.F.R. § 351.404(b)–(c) (2018)[3] (providing that Commerce shall consider a third country market viable if the aggregate quantity of sales are at a sufficient level, but setting forth an exception where it is established, to the satisfaction of Commerce, that, <u>inter alia</u>, the prices are not representative); <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,357 (Dep't Commerce May 19, 1997);[4] <u>see also</u> <u>Alloy Piping Prods. v. United States</u>, 26 CIT 360, 339–340 & n.7, 201 F. Supp. 2d 1267, 1276–77 & n.7 (2002) (citations omitted). Commerce's determination that sales into a third country comparator market are not representative must be supported by substantial evidence. <u>See, e.g.</u>, <u>Motor Vehicle</u>

---

[3] Unless otherwise indicated, further citations to Title 19 of the Code of Federal Regulations are to the 2018 edition.

[4] The regulatory history to 19 C.F.R. § 351.404 provides, in pertinent part, that:

> In the Department's view, the criteria of a "particular market situation" and the "representativeness" of prices fall into the category of issues that the Department need not, and should not, routinely consider . . . the [Statement of Administrative Action] at 821 recognizes that the Department must inform exporters at an early stage of a proceeding as to which sales they must report. This objective would be frustrated if the Department routinely analyzed the existence of a "particular market situation" or the "representativeness" of third country sales . . . the party alleging . . . that sales are not "representative" has the burden of demonstrating that there is a reasonable basis for believing that a "particular market situation" exists or that sales are not "representative."

<u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. at 27,357; <u>see also</u> Uruguay Round Agreements Act, Statement of Administrative Action, H.R. DOC. NO. 103-826, vol. 1, at 821 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4162.

Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)).

Here, Commerce acknowledges that the CITT's finding that SeAH's sales into Canada were dumped is the only record evidence supporting its prior determination that those sales are unrepresentative. See Remand Results at 22–23. Although Tenaris USA believes that Commerce could have reasonably addressed detracting evidence that Canada's dumping law is materially inconsistent with U.S. dumping law, see Def-Intervenors' Br. at 7–9, Commerce observes that none of the parties point to record evidence that would allow it to substantiate such an analysis. See Remand Results at 22–23. Given that third country sales at a sufficient aggregate level are presumptively representative, see 19 C.F.R. § 351.404(b)–(c), and that record evidence detracts from the evidentiary weight that Commerce assigned to the CITT's findings when determining that SeAH's Canadian sales were unrepresentative, Commerce's determination is reasonable. Commerce's reliance on SeAH's third country sales to determine normal value is sustained.

## II. Commerce's CV Calculation

### 1. Particular Market Situation

Although Commerce respectfully disagrees with the court's holding that its PMS determination was unsupported by substantial evidence, see Husteel, 44 CIT at __, 471 F. Supp. 3d at 1361–64, Commerce indicates that it is unable to point to additional record evidence to overcome the court's objections.  See Remand Results at 6–7.  None of the parties challenged Commerce's reversal.  See id. at 23–24. Commerce's decision to reverse its determination that a PMS in Korea distorted the cost of producing WLP during the POR under respectful protest is sustained.

### 2. Profit and Selling Expense Information

As explained, Commerce respectfully disagrees with the court's holding that its decision to disregard SeAH's third country sales is unsupported by substantial evidence.  See, e.g., Remand Results at 24.  However, since it now "rel[ies] on SeAH's third country sales as the CV profit and selling expenses for NEXTEEL, rather than data from [Hyundai]," Commerce concludes that whether its decision to use Hyundai's information from the first administrative review is supported by substantial evidence or otherwise in accordance with law is moot.  Remand Results at 7, 24–25.  Although Tenaris USA submits that Commerce should use Hyundai's CV profit and selling expense rate information, Tenaris USA's position is dependent on Commerce deciding to disregard SeAH's third country sales.  See Def-Intervenors' Br. at 9–13.  Commerce otherwise observes that none of the parties point to "any

record evidence that would allow Commerce to overcome the Court's objections[.]"

Remand Results at 24–25.  Commerce's decision to use SeAH's third country sales to determine CV profit and selling expenses for NEXTEEL under respectful protest is sustained.

### 3.  Reclassification of NEXTEEL's Suspended Production Losses

NEXTEEL contends that Commerce fails to explain why its decision to reclassify losses reported by NEXTEEL relating to the suspended production of certain product lines is consistent with 19 U.S.C. § 1677b(f)(1)(A).  See NEXTEEL's Br. at 11–14.  Defendant and Tenaris USA submit that Commerce reasonably explains that its determination comports with its practice of adjusting costs where a company's normal books and records do not reasonably reflect production costs.  See Def.'s Resp. Br. at 12–15; Def-Intervenors' Br. at 19–22.  According to Defendant, NEXTEEL's objections amount to a mere disagreement with Commerce's evidentiary conclusion that the length of the suspension of NEXTEEL's product lines indicate that the costs incurred are necessarily borne by NEXTEEL's subject products.  See Def.'s Resp. Br. at 12–15.  For the following reasons, Commerce's determination is sustained.

When determining constructed value of subject merchandise, Commerce normally calculates costs and expenses "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles [("GAAP")] of the exporting country (or the producing

**PUBLIC VERSION**

country, where appropriate)[.]"  19 U.S.C. § 1677b(f)(1)(A).  However, even if a respondent's normal books and records are GAAP-compliant, the statute affords Commerce some discretion to depart from those records if it determines that they do not "reasonably reflect the costs associated with the production and sale of the merchandise."  See 19 U.S.C. § 1677b(f)(1)(A); see also Remand Results at 9.

According to Commerce, its "normal practice in determining whether particular items should be included in G&A is to review the nature of the item and its relation to the general operations of the company as a whole."  Remand Results at 29 (citing Magnesium Metal from the Russian Federation, 70 Fed. Reg. 9,041 (Dep't Commerce Feb. 24, 2005) (notice of final determination of sales at less than fair value) and accompanying Issues and Decision Memo. at Cmt. 10, A-821-819, (Feb. 24, 2005) available at  https://enforcement.trade.gov/frn/summary/russia/E5-765-1.pdf  (last visited May 25, 2021)).  Commerce's position is that expenses owing to extended (as opposed to routine or maintenance-related) suspension of specific product lines no longer relate to ongoing production of those specific products.  See Remand Results at 8–9.  Thus, it appears to be Commerce's practice to "associate[ ] these costs with the general operations of the company as a whole (i.e., with general expenses), and not . . . to products associated with that production line (i.e., [cost of goods sold])."  See id. at 9.  Pointing to 19 U.S.C. § 1677b(b)(3)(B), Commerce reasons that the statute directs it to include, as part of its calculation of the COP for the subject merchandise, "costs associated with the general operations of the company (i.e., normal costs that

**PUBLIC VERSION**

are not directly associated with a product).” <u>Remand Results</u> at 30 (citing 19 U.S.C.

§ 1677b(b)(3)(B)).

Reasonably discernible from its observation that,[5] because “[n]o revenue from

any products normally produced on [the suspended] lines was generated for the

period . . . the costs associated with the suspended production lines were necessarily

covered by all the other products NEXTEEL produced[,]” <u>see</u> <u>id.</u> at 30, is Commerce’s

supposition that costs should generally relate to a benefit during the period of review,

that costs associated with extended suspension of production of non-subject

merchandise no longer relate to the benefit of ongoing production and revenue

---

[5] Commerce’s explanation as to how its methodology comports with the requirements of 19 U.S.C. § 1677b(f)(1)(A) is less than ideal.  Commerce states that 19 U.S.C. § 1677b(b)(3)(B) directs it to include “as part of [costs of production] costs associated with the general operations of the company (i.e., normal costs that are not directly associated with a product)[,]” <u>Remand Results</u> at 30, but § 1677b(b)(3)(B) directs Commerce to determine G&A expenses “based on actual data pertaining to production and sales of the foreign like product[.]” <u>Id.</u>  Commerce admits that it seeks to include “non-product costs as G&A expenses,” then summarily concludes that this “does not contravene the statute.” <u>Remand Results</u> at 29.  As NEXTEEL submits, left unstated by Commerce’s analysis is whether, why, and to what extent losses associated with the suspension of product lines for the production of non-subject merchandise relate to G&A expenses incurred in the production of subject merchandise, such that NEXTEEL’s GAAP-compliant accounting does not reasonably reflect costs. <u>See, e.g.</u>, NEXTEEL’s Br. at 12–13.  Nonetheless, the court can discern from Commerce’s analysis its view that an expense should relate to a benefit, and that in this instance it makes more sense to account for an expense that is incurred over an extended period of time where there is no related benefit (in this case, no ongoing production and revenue generation) as an expense incurred by the general operations of a company. <u>Cf., e.g.</u>, <u>Saha Thai Steel Pipe (Public) Co. v. United States</u>, 635 F.3d 1335, 1341–43 (Fed. Cir. 2011); <u>see also</u> <u>Remand Results</u> at 8.  For the reasons stated above, Commerce’s approach is reasonable under 19 U.S.C. § 1677b(f)(1)(A).

generation from those products during the period of review, see, e.g., id. at 8, and

that, as a consequence, those costs more reasonably relate to the general operations

of the company.  The court cannot say that it is unreasonable for Commerce, in its

expertise, to determine that a company's attribution of costs relating to the extended

suspension of certain non-subject product lines as costs of goods sold results in an

inaccurate reflection of the general expenses incurred in the production of subject

merchandise.  Although a company may shut down product lines from time to time

for various intervals, at some point an extended shutdown suggests that the costs of

that product line are more akin to expenses borne by the company in its general

operations.[6]  Therefore, Commerce's determination is sustained.

### 4.  NEXTEEL's Non-Prime WLP Products

NEXTEEL argues that Commerce erred in continuing to reallocate the cost of

production of its non-prime products and that Commerce's decision is inconsistent

with the Court of Appeals' decision in Dillinger.  See NEXTEEL's Br. at 2–10 (citing,

inter alia, Dillinger, 981 F.3d 1318).  Defendant counters that Commerce complied

---

[6] According to NEXTEEL, "Commerce has still not provided clarity to respondents as to which production suspensions" may be considered temporary as opposed to prolonged.  NEXTEEL's Br. at 13.  However, NEXTEEL cites no authority to support the position that Commerce may not assess the length of a shutdown on a case-by-case basis.  Here, Commerce explains that "[t]he production shutdown started before the POR and continued after the POR, establishing that it was not a routine shutdown but a prolonged shutdown[.]"  Remand Results at 30.  Commerce adds that although "no specific time is associated with a routine shutdown, normally the shutdown is short-term."  Id. at 31.  It is enough that Commerce reasonably explains its determination in this instance.

with the court's remand order by clarifying its practice and explaining why its

practice is reasonable.  See Def.'s Resp. Br. at 15–18.  Moreover, Defendant submits

that Commerce's determination is consistent with the Court of Appeals' decision.  See

id. at 18–19 (citing, inter alia, Dillinger, 981 F.3d 1318).  For the following reasons,

Commerce's determination is remanded.

As explained, Commerce normally calculates costs "based on the records of the

exporter or producer of the merchandise, if such records are kept in accordance with

the [GAAP]" of the exporting or producing country.   19 U.S.C. § 1677b(f)(1)(A).

However, even if a respondent's records are kept in accordance with the GAAP of the

exporting or producing country, Commerce departs from those records where it

determines that a respondent's records do not fairly reflect the costs associated with

the production and sale of the merchandise.  See Remand Results at 10; see also 19

U.S.C. § 1677b(f)(1)(A).

In this case, NEXTEEL's books and records allocated the costs of prime and

non-prime products based on costs incurred in the production of each.  Commerce

reallocated the costs as identified in the NEXTEEL's books and records.  See, e.g.,

Final Decision Memo at 42–43.  Namely, Commerce shifted non-prime costs, which it

perceived could not be recovered from sales of non-prime product, to prime product.

See, e.g., id.; Memo. Re: NEXTEEL's Cost of Production & Constructed Value

Calculation Adjustments for the Final Determination at Attach. 2B, PD 327, CD 371,

bar codes 3847069-01, 3847068-01 (June 11, 2019).[7]  This reallocation resulted in a

higher per unit cost for prime products.  See, e.g., Oral Arg. at 01:20:00–01:21:22,

June 25, 2020, ECF No. 79.

> In making its reallocation, Commerce explains its practice:
>
> is to analyze the products sold as non-prime to determine whether they are truly the production of "good" product or if they are more akin to yield loss and the sale of the scrapped "bad" product in an attempt to recover whatever value they can get. Our analysis looked at several factors including: (1) how such products are treated in the respondent's normal books and records; (2) whether they remain in scope; and (3) whether they can still be used in the same applications as the prime subject merchandise.

Remand Results at 34.  Although an explanation of how Commerce applies these

criteria is lacking, it is reasonably discernible that Commerce considers the three

criteria as part of a broader examination into the totality of the circumstances to

ascertain whether non-prime products should be regarded as scrap or yield loss under

the statute, such that costs of those products (less any offset recovered by their sale)[8]

is a cost of the prime product.  See id. at 9–10, 29 (citing, inter alia, [WLP] From

---

[7] On August 22, 2019, Defendant submitted indices to the confidential and public administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF No. 36-1 and 36-2, respectively.  All references in this opinion to documents from the administrative record underlying Commerce's final determination are identified by the numbers assigned by Commerce in those indices and preceded by "PD" and "CD" to denote public or confidential documents.

[8] According to Commerce, the latter category of "bad" non-prime products "should not be allocated a cost akin to good production."  Remand Results at 36.  "Instead, the non-prime product should be given credit for whatever salvage value it can command."  Id. (citation omitted).

[Korea], 80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) (final determination of

sales at less than fair value) and accompanying Issues and Decision Memo. at Cmt.

9,        A-580-876,        (Oct.        5,        2015),        available        at

https://enforcement.trade.gov/frn/summary/korea-south/2015-25980-1.pdf        (last

visited May 25, 2021) ("WLP from Korea IDM"); Steel Concrete Reinforcing Bar From

Mexico, 82 Fed. Reg. 27,233 (Dep't Commerce June 14, 2017) (final results of [ADD]

administrative review; 2014–2015) and accompanying Issues and Decision Memo. at

Cmt.      3,      A-201-844      (June      7,      2017),      available      at

https://enforcement.trade.gov/frn/summary/mexico/2017-12304-1.pdf   (last   visited

May 25, 2021)); see also Final Decision Memo at 42.

    More problematic, however, is Commerce's explanation of how a methodology

that calculates costs of non-prime products based on its resale value and reallocates

the difference between the resale value and actual costs of producing non-prime

products to the costs of prime products accords with the Court of Appeals' instruction

to use actual costs when calculating constructed value.  See Dillinger, 981 F.3d at

1321–24.  Dillinger holds that Commerce must calculate constructed value based on

the actual costs incurred in the production of prime and non-prime products.  See 981

F.3d at 1321–24 & n.1.  The Court of Appeals explained that the legislative history

to § 1677b(f) demonstrates Congress' clear intent that costs used to construct the

value of subject merchandise "accurately reflect the resources actually used in the

production of the merchandise in question[.]"  Id. at 1322  (quoting S. REP. NO. 103-

412, at 75 (1994)); see also id. at 1321 n.1.   Since Commerce's methodology involves

using likely sales value for non-prime products instead of actual costs as reported by

NEXTEEL, Dillinger calls into question whether or not Commerce's treatment of

NEXTEEL's non-prime WLP products complies with the statute.   Commerce's

explanation of its practice is inadequate in light of Court of Appeals' precedent.   See

Hyundai Elecs. Indus. v. United States, 30 CIT 63, 65–66, 414 F. Supp. 2d 1289,

1291–92 (2006).   Therefore, the court must remand for further explanation or

reconsideration.

## III.   Use of SeAH's Average Costs for the Review Period

SeAH asserts Commerce's refusal to use quarterly-average costs to calculate

SeAH's normal value is not supported by substantial evidence.[9]   See SeAH's Br. at 3–

---

[9] SeAH submits that, consonant with Commerce's position that it must "find
correlation between the sales and cost throughout the entire POR (or at least the
majority of the quarters)," an analysis of:

> the quarterly costs and sales prices from one quarter to the next for the
> control numbers ("CONNUMs") that had cost and sales data for all or
> most of the quarters of the review period demonstrates that SeAH's
> prices and costs were [[                              ]] throughout the entire review
> period and not just between two quarters.

See SeAH's Br. at 5.   Moreover, SeAH argues that Commerce's analysis of cost and
price data for quarters not subject to significant cost-fluctuations is unreasonable.
See id. at 7–11.

Consol. Court No. 19-00112                                          Page 23

**PUBLIC VERSION**

11.[10] Defendant argues that Commerce reasonably determined that its quarterly cost

methodology was not warranted.  <u>See</u> Def.'s Resp. Br. at 9–12.  For the following

reasons, Commerce's determination is sustained.

When determining normal value based on home market or third country sales,

19 U.S.C. § 1677b(b) requires that Commerce disregard sales that are made below

the cost of production.  Commerce usually compares prices to a weighted-average of

costs incurred throughout the entire POR (i.e., annual costs).  <u>See</u> <u>Remand Results</u>

at 15; <u>see also</u> <u>id.</u> 13 & n.52 (citing, <u>inter alia</u>, <u>Carbon and Certain Alloy Steel Wire</u>

<u>Rod from Canada</u>, 71 Fed. Reg. 3,822 (Dep't Commerce Jan. 24, 2006) (notice of final

results of antidumping duty administrative review) and accompanying Issues and

Decisions Memo. at Cmt. 5, A-112-840, (Jan. 24, 2006) <u>available at</u>

https://enforcement.trade.gov/frn/summary/canada/E6-823-1.pdf (last visited May,

25, 2021)); <u>Antidumping Methodologies for Proceedings that Involve Significant Cost</u>

<u>Changes Throughout the Period of Investigation (POI)/[POR] that May Require</u>

<u>Using Shorter Cost Averaging Periods</u>, 73 Fed. Reg. 26,364, 26,365 (Dep't Commerce

May 9, 2008) (request for comment) ("<u>Cost Averaging Methodology</u>").  According to

Commerce, "[r]elying on an annual average cost tends to smooth out . . . short-term

---

[10] Although the heading to SeAH's argument states that Commerce's calculation of
SeAH's constructed value is unreasonable, <u>see</u> SeAH's Br. at 3, the court
understands—from SeAH's references to Commerce's below cost sales analysis, <u>see,</u>
<u>e.g.</u>, SeAH's Br. at 8, and the fact that Commerce used SeAH's third country sales to
determine SeAH's normal value, <u>see</u> Remand Results at 6—that the reference to
constructed value is unintentional.

per-unit cost fluctuations resulting in a normalized average production cost to be compared to sales prices over the same extended period of time." Id., 73 Fed. Reg. at 26,365 (citations omitted).

Nonetheless, Commerce deviates from its standard methodology when it determines that there are significant changes in costs during the POR. See generally id., 73 Fed. Reg. 26,364; see also Final Decision Memo at 55 (citing Steel Concrete Reinforcing Bar From Taiwan, 82 Fed. Reg. 34,925 (Dep't Commerce July 27, 2017) (final determination of sales at less than fair value) and accompanying Issues and Decision Memo. at Cmt. 2, A-583-859, (July 20, 2017)), available at https://enforcement.trade.gov/frn/summary/taiwan/2017-15840-1.pdf (last visited May 25, 2021) ("Rebar from Taiwan IDM"). In such instances, Commerce instead relies on quarterly-average costs, provided that there is a linkage (i.e., reasonable correlation) between costs and sales information during the shorter averaging periods. See Rebar from Taiwan IDM at Cmt. 2; see also Final Decision Memo at 55.

Husteel concluded that it was not discernible from Commerce's analysis in its final determination whether and to what extent Commerce considered the correlation between SeAH's prices and costs between the first and second quarters. See 44 CIT at __, 471 F. Supp. 3d at 1368–69. On remand, Commerce acknowledges that record evidence shows SeAH's "prices and costs are correlated between the first and second quarter of the POR[,]" but nonetheless clarifies that departure to its quarterly pricing methodology requires linkage between prices and costs throughout the entire POR

because relying on cost-averages during shorter review periods where prices "have

not been set in reaction to the changing costs . . . is no more accurate than

[Commerce's] normal annual average cost and price comparison methodology."

Remand Results at 15–16; see also Husteel, 44 CIT at __, 471 F. Supp. 3d at 1369.

Commerce's judgment, in light of record evidence showing that prices did not react to

cost-fluctuations, that comparing prices to cost-averages for shorter periods would

not further its goal of calculating a dumping margin that accurately reflects a

company's normal selling practices, and thus would not justify departure from

Commerce's standard methodology, is reasonable. See Remand Results at 15–16; see

also, e.g., Cost Averaging Methodology, 73 Fed. Reg. at 26,365 (citing, inter alia, 19

C.F.R. § 351.102 (2008)).   Even if a company experienced a significant cost-

fluctuations during a portion of the POR, evidence that the company's prices do not

react to cost-fluctuations during the rest of the POR  logically suggests that the cost-

fluctuations did not impact the company's pricing practices.   Thus, it is reasonable

to infer that the cost-fluctuations are not germane to Commerce's inquiry into

whether, and to what extent, the company engaged in underselling during the POR.

At the very least, it is reasonable for Commerce to find, based on such inferences,

that the circumstances do not provide a compelling enough reason to justify departure

from its standard practice, which helps Commerce calculate an accurate dumping

**PUBLIC VERSION**

margin by normalizing prices across the POR.[11]    Therefore, SeAH's attempt to demonstrate that prices are reasonably correlated throughout the POR by pointing to evidence that "prices for subject merchandise were substantially above unit costs during every quarter of the review" is unavailing.  See SeAH's Br. at 4–7.

For its part, SeAH submits that Commerce's analysis is unreasonable under the particular circumstances of this case because "the use of a single review-period average cost will overstate the cost used to test sales during the first quarter, and thus incorrectly and unfairly find that sales prices during the first quarter were below cost, even though those sales were above costs at the time they were made."  SeAH's Br. at 10; see also id. at 7–11 (citing, inter alia, Nucor Corp. v. United States, 33 CIT 207, 287, 612 F. Supp. 2d 1264, 1332 (2009)).  Moreover, according to SeAH, since changes in unit costs and unit prices were negligible, Commerce's methodology effectively requires that SeAH's prices be highly sensitive to changes in costs, as opposed to just reasonably correlated.  SeAH's Br. at 8 & n.12.[12]  SeAH's arguments

---

[11] According to Commerce, requiring that "changes in selling prices reasonably correlate to changes in unit costs" also promotes a more "reasonable and predictable criteria" because "[o]therwise[,] in every case there can be outliers and differing facts that are only argued by interested parties if it is beneficial."  Remand Results at 26. To the extent that Commerce furthers its overarching obligation to calculate an accurate dumping margin, it is not unreasonable to take into account such practical constraints when developing its methodology.

[12] SeAH points to Table 2 in its brief, see SeAH's Br. at 7, which, as described by SeAH, indicates that "cost changes between the second and third quarter were between [[    ]] and [[    ]] percent, and the cost changes between the third and fourth quarters were between [[    ]] and [[    ]] percent."  See SeAH's Br. at 8 n.12.

do not persuade.    Even if SeAH offers another reasonable interpretation of the evidence, that alone is insufficient to demonstrate that Commerce's determination that SeAH's costs and prices were not linked throughout the POR—based on record evidence showing that SeAH's prices and costs trended in the opposite direction—is unreasonable.    The court cannot reweigh the evidence.    See <u>Downhole Pipe & Equipment, L.P. v. United States</u>, 776 F.3d 1369, 1376 (Fed. Cir. 2015).

## IV.   **Allocation of G&A Expenses when Calculating Constructed Export Price**

SeAH argues that Commerce's continued treatment of G&A expenses incurred by its U.S. sales affiliate, PPA, as indirect selling expenses, and resultant decision to deduct those expenses from SeAH's constructed export price pursuant to 19 U.S.C. § 1677a(d)(1)(D), is not supported by substantial evidence and otherwise not in accordance with law.  See SeAH's Br. at 11–16.  According to SeAH, the statute does not authorize Commerce to deduct non-selling expenses when calculating constructed export price, and Commerce's classification of PPA's G&A expenses as indirect selling expenses is unreasonable given the fact that PPA performs both manufacturing and selling functions.  See id.  Defendant counters that Commerce reasonably determined that PPA predominantly performs selling functions for SeAH, and thus, with respect to calculation of SeAH's constructed export price, PPA's G&A expenses are reasonably regarded as indirect selling expenses.  See Def.'s Resp. Br. at 6–9.  For the following reasons, Commerce's determination is sustained.

As explained, when reviewing an ADD order, Commerce calculates dumping margins by comparing the normal value of the merchandise to its export price—here, constructed export price.  See 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C); see also id. at §§ 1677(35), 1677a.  Commerce uses constructed export price to determine the dumping margin when the producer or exporter of the subject merchandise sells to an affiliated buyer.  See 19 U.S.C. § 1677a(b).  The constructed export price is the price at which the subject merchandise is first sold to the affiliated buyer as adjusted under subsections (c) and (d).  See id.  Relevant here, subsection (d)(1) requires Commerce to deduct various selling expenses from the constructed export price, and subsection (d)(2) requires Commerce to deduct costs of further manufacture or assembly from the constructed export price.  See id. at § 1677a(d).  Pursuant to 19 U.S.C. § 1677a(d)(1)(D), Commerce normally calculates, and deducts from the constructed export price, indirect selling expenses.

In Husteel, the court concluded that Commerce did not explain why its treatment of PPA's G&A expenses as indirect selling expenses of SeAH was reasonable and authorized under the statute.  See 44 CIT at __, 471 F. Supp. 3d at 1370.  Here, Commerce explains that it treats PPA's G&A expenses as indirect selling expenses because "PPA's primary function is to facilitate SeAH's U.S. sales[,]" Remand Results at 18, and PPA's "G&A activities support those selling operations." Id. at 20; see also id. at 38 ("PPA is predominantly a selling entity and, thus, it is reasonable to treat its G&A expenses as selling expenses.").  Commerce adds that "it

is not disputed that PPA has no production capabilities of its own[.]" <u>Id.</u> at 18.  Given that 19 U.S.C. § 1677a(d)(1)(D) instructs Commerce to include in its deductions from the constructed export price "any selling expenses not deducted" under the other subparagraphs, Commerce explains that, where a "U.S. affiliated selling entity provides no further-manufacturing services," its policy is to regard "everything that the entity does" as "part of its selling activities." <u>Remand Results</u> at 20.

Commerce's determination to treat PPA's G&A expenses as indirect selling expenses for purposes of calculating SeAH's constructed export price is reasonable. As Commerce explains, the statute does not explicitly instruct Commerce as to how it should treat G&A expenses incurred by a U.S. sales affiliate. <u>See id.</u> at 19–20.  It stands to reason that, under 19 U.S.C. § 1677a(d)(1)(D), Commerce would regard expenses incurred pursuant to general operations of a company that mainly exists to facilitate SeAH's U.S. sales as "indirect selling expenses" because the benefits derived from those expenses predominantly further SeAH's selling activities in the United States (as opposed, for example, to SeAH's ability to produce merchandise). <u>See</u> <u>Remand Results</u> at 20 ("The G&A expenses of the U.S. affiliated selling entity are associated with supporting and accomplishing the greater selling function of the entity, which is to advance sales in the U.S. market for the respondent, SeAH."); <u>see also</u> <u>id.</u> at 38–41.

SeAH criticizes Commerce for "simply re-defining the nature of PPA's operation for the purposes of the [r]edetermination, despite the fact that no new information concerning PPA's operations has been placed on the record." SeAH's Br. at 12–14.[13]  However, Commerce may reassess the record and its findings on remand so long as it reasonably explains its redetermination, see SEC v. Chenery Corp., 332 U.S. 194, 199–201 (1947), and SeAH does not point to detracting record evidence that impugns the reasonableness of Commerce's rationale.  Commerce's determination is sustained.

## V.      Ministerial Errors in Recalculating SeAH's Margins

Defendant-Intervenor Tenaris USA requests that the court sustain a correction Commerce made to its calculation of SeAH's dumping margin on remand, where Commerce inadvertently converted Korean Won values to U.S. dollars twice in its margin calculation program.  Def-Intervenors' Br. at 9 (citation omitted).  The parties do not contest Tenaris USA's request.  Since the court is sustaining Commerce's remand redetermination with respect to its calculation of SeAH's dumping margin, the court also sustains Commerce's ministerial correction.

---

[13]  In disputing the proper classification of G&A expenses under the statute more generally, SeAH appears to misapprehend Commerce's inquiry and construction of the statute.  See SeAH's Br. at 14–16.  Here, Commerce seeks to determine how to classify PPA's G&A expenses as they relate to SeAH's operations in the United States.  See Remand Results at 17–21, 38–41.

**CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that Commerce's reliance on SeAH's third country sales into Canada to determine the normal value of its subject merchandise is sustained; and it is further

**ORDERED** that Commerce's decision to reverse its PMS determination is sustained; and it is further

**ORDERED** that Commerce's decision to use SeAH's third country sales to calculate NEXTEEL's CV profit and selling expenses is sustained; and it is further

**ORDERED** that Commerce's reclassification of NEXTEEL's suspended production losses is sustained; and it is further

**ORDERED** that Commerce's reliance on SeAH's annual weighted-average costs is sustained; and it is further

**ORDERED** that Commerce's treatment of PPA's G&A expenses for purposes of calculating SeAH's constructed export price is sustained; and it is further

**ORDERED** that Commerce's ministerial correction to its calculation of SeAH's dumping margin is sustained; and it is further

**ORDERED** that Commerce's decision to adjust NEXTEEL's prime and non-prime costs is remanded for further explanation or reconsideration consistent with this opinion; and it is further

Consol. Court No. 19-00112                                                    Page 32
**PUBLIC VERSION**

     **ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

     **ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

     **ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination; and it is further

     **ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

     **ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing of its remand redetermination.


                                   /s/ Claire R. Kelly
                                   Claire R. Kelly, Judge


Dated:      June 7, 2021
             New York, New York